# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY.

## ON APPEAL FROM THE COURT OF CHANCERY, AND THE PREROGATIVE COURT.

### JUNE TERM, 1904.

---

DeWitt C. Blair, individually and as executor of
John I. Blair, deceased, respondent,

*v.*

Charles Scribner et al., appellants.

[Argued March 11th and 14th, 1904. Decided March 6th, 1905.]

J. I. B., by his will, bequeathed to his son, D. (who was also named in the will as sole executor), a specified number of bonds and shares of stock, in named corporations, in trust, for the benefit of his grandchildren, and then provided as follows: "And it is my further meaning that if I should not leave at my decease all of the bonds or stocks mentioned in my said will, and given to my said son D. in trust, he shall not be required to supply said bonds and stocks, but only take such as I may leave."—*Held*, that the "further meaning" clause of the will did not operate to change the character of these bequests from general to specific legacies; *held further*, that the purpose of the testator expressed in the

"further meaning" clause of his will was that his executor, instead of supplying the very securities named by him in the trust bequests, in case they were not found in his estate at his death, should take from such other bonds and stocks as he might leave a sufficient quantity to supply the deficiency in value.

On appeal from a decree advised by Vice-Chancellor Emery, whose opinion is reported in *65 N. J. Eq.* (*20 Dick.*) *498.*

*Mr. Richard V. Lindabury* and *Mr. John E. Parsons* and *Mr. John P. Wilson* (of the New York bar), for the appellants.

*Mr. George M. Shipman* and *Mr. John W. Griggs* and *Mr. William B. Hornblower* and *Mr. James Byrne* (of the New York bar), for the respondent.

The opinion of the court was delivered by

GUMMERE, CHIEF-JUSTICE.

John I. Blair died December 22d, 1899. He left a will which bears date March 5th, 1878, and was probated December 28th, 1899. He left surviving him one son, DeWitt Clinton Blair, the respondent, and five grandchildren, Charles Scribner, Arthur H. Scribner, Emma Scribner Larned, Isabel Scribner Fitzhugh and Clara Blair Mitchell, descendants of his two deceased daughters, Emma Elizabeth Scribner and Amelia A. Mitchell. At the time of making his will, he had one other grandchild, John Blair Scribner, who predeceased him. At the date of the will the estate of Mr. Blair, taking his securities at par, amounted to $8,155,801.52; his debts amounted to $254,603.06. In the first twenty paragraphs of his will the testator gave sundry legacies to sixteen different persons and institutions, most of them in trust, amounting in all to $305,000, and in addition an annuity to his widow. He then proceeded to establish six different trusts for the benefit of his grandchildren and their descendants, amounting in the aggregate to $2,952,000. The balance of his estate he gave to his son, the respondent, whom he also created sole executor of his will. The several trust funds were practically equal in amount, allowing for the

deduction of certain advancements made to some of the grand-children; the words used by the testator in creating them were in each case almost identical, and a recital of the provisions of one is, therefore, sufficient to show their form. The John Blair Scribner trust, which comes first in the will, may be taken as an example. It is in the following words:

"I give and bequeath unto my son, DeWitt Clinton Blair, twenty-five thousand dollars in the bonds of the Sioux City and Pacific Railroad Company, seven thousand dollars in the bonds of the Green Bay and Lake Pepin second mortgage bonds, one thousand dollars in the bonds of the West Point Precinct Company, five thousand dollars in the bonds of the Fremont, Elkhorn & Missouri Valley Railroad Company second mortgage bonds, fifteen thousand dollars in the bonds of the Fremont, Elkhorn & Missouri Railroad Company first mortgage bonds, one thousand dollars in the bonds of the Burlington, Cedar Rapids & Northern Railroad Company, one thousand dollars in the bonds of the Maple River Railroad Company, one thousand dollars in the bonds of the Minneapolis and St. Louis Railroad Company. I also give & bequeath unto my said son, DeWitt C. Blair, fifty shares of the capital stock of the Chicago, Iowa and Nebraska Railroad Company, one thousand shares of the capital stock of the Cedar Rapids & Missouri River Railroad Company, fifty shares of the preferred capital stock of the Cedar Rapids and Missouri River Railroad Company, one thousand shares of the capital stock of the Iowa Railroad Land Company, two hundred and fifty shares of the Iowa Falls & Sioux City Railroad Company, one hundred & sixty shares of the capital stock of the Delaware, Lackawanna & Western Railroad Company, forty shares of the capital stock of the Warren Railroad Company, forty shares of the capital stock of the Sussex Railroad Company, two hundred shares of the capital stock of the Lackawanna Iron & Coal Company, two hundred shares of the capital stock of the Blairstown Lot & Land Company, sixty shares of the Sioux City & Iowa Falls Town Lot and Land Company's capital stock, two hundred shares of the capital stock of the Sioux City & Pacific Railroad Company, twenty shares of the preferred capital stock of the Sioux City & Pacific Railroad Company, thirty shares of the capital stock of the Moingona Coal Company, fifty shares of the capital stock of 'The Silver Peak Mines Co.,' one hundred shares of the capital stock of the Belvidere National Bank, twenty shares of the capital stock of the First National Bank of Cedar Rapids, forty shares of the capital stock of the Missouri Valley Land Company, seventy shares of the capital stock of the Houston and Texas Central Railroad Company, one hundred & thirty shares of the capital stock of the Fremont, Elkhorn & Missouri Valley Railroad Company, one hundred shares of the Green Bay & Lake Pepin Railroad Company's capital stock, twenty shares of the capital stock of the Burlington, Cedar Rapids & Northern Railway Company. Fifty shares of the capital stock of the Maple River Railroad Company, one hundred shares of the capital stock of the Blairstown Railway Company, & ten shares of the

capital stock of the People's Street Railway Company of Luzerne county (Pa.), the said bonds to be taken at their face value; *in trust*, nevertheless, that he will hold the said bonds & stocks, or such other as he may take in place thereof, & pay the interest arising therefrom, in semi-annual payments to my grandson, the said J. Blair Scribner, during the period of his natural life, and after his death to pay the income or interest arising therefrom to his children, until the youngest child shall arrive at the age of twenty-one years, and then to divide the said bonds & stocks, or any substituted in the place thereof, or the moneys arising from the sale thereof, in equal proportions & values between the children of the said J. Blair Scribner, or their legal representatives, and if the said J. Blair Scribner shall die without issue him surviving, or any legal representative or representatives of such issue, then I order & direct my said trustee to divide the said bonds & stocks, or the substituted securities therefor, or the moneys arising from the sale thereof, between the brothers & sisters of the said J. Blair Scribner, in equal proportions, and in case any brother or sister of the said J. Blair Scribner should be dead at that time, then to give such deceased brother's or sister's share to his children or legal representatives, but if such brother or sister should leave no child or children him or her surviving, then to divide it equally among such brothers & sisters of the said J. Blair Scribner as may be then living."

After creating these trusts and providing for the ultimate distribution of the funds thereby bequeathed, the testator then added this clause to his will:

"And it is my further meaning that if I should not leave at my decease all of the bonds or stocks mentioned in my said will and given to my said son DeWitt Clinton Blair in trust, he shall not be required to supply said bonds and stocks, but only take such as I may leave."

At the time of making his will the testator was possessed of all of the bonds and stocks mentioned in the trust provisions of the instrument and in quantities much greater than therein designated. At his death, however, there remained in the estate only about $425,000 of these securities at their par value. Of the remainder some had been sold by the testator, some had been exchanged by him for other securities, and still others (bonds) had matured and were paid. Upon discovering these facts, DeWitt Clinton Blair, the respondent, individually and as executor, filed his bill in this cause to obtain a construction of the testator's will in order to have it judicially determined whether, as executor, he should deliver to himself, as trustee, under the trusts created for the benefit of the testator's grand-

children, only such of the stocks and bonds mentioned in the trust provisions as the testator left at his death, or whether he should deliver to himself, as trustee, other securities or moneys in addition thereto, and if the latter, to what extent.

The learned vice-chancellor before whom the case was heard expressed the opinion that if those clauses of the will which created the several trusts were alone to be considered, the legacies given thereby must be held to be general. (He considered them, so far as the gifts of bonds were concerned, to be demonstrative— that is, legacies primarily payable from designated securities pointed out by the testator and part of his estate, but payable in any event, even though the designated source should fail.) But he found in the language of the "further meaning" clause of the will, read in the light of the fact that at the time of the execution of that instrument the testator had in his possession stocks and bonds of the various kinds, specified in the several trust clauses, in quantities greater than therein mentioned, what seemed to him satisfactory evidence that the testator intended these legacies to be specific and not general or demonstrative. He therefore held that the trustee was entitled to receive, for the purposes of the several trusts, only such of the bonds and stocks mentioned in the trust clauses of the will as remained in the testator's estate at his death, and that the rule of ademption applied to such of the bonds and stocks as had been disposed of by the testator in his lifetime.

We concur in the opinion expressed by the learned vice-chancellor that, according to well-settled rules of construction, the legacies given for the benefit of the grandchildren must be held to be general and not specific if the trust clauses of the will alone are considered. The authorities cited by him in support of this view are convincing of its soundness. But the fact that the testator had in his possession at the time of making his will stocks and bonds of the various kinds mentioned in these trust clauses, and in excess of the amounts named therein, does not seem to us, either taken alone or in conjunction with the other parts of the will, to throw any light upon the character of these legacies. The authorities cited in the opinion of the learned vice-chancellor, and just referred to, show that it is only

in cases where the testator has property of the kind mentioned in the legacy that the question ever arises whether the legacy is general or specific; and in those cases it is held that, notwithstanding such possession, a bequest in the form used in the present case creates a general and not a specific legacy.

Does the "further meaning" clause of the will operate to change the character of these legacies from general to specific? It is to be borne in mind that the testator, by these legacies, was providing for his own flesh and blood—for those whose claim upon his bounty was second only to that of his son. His expressed purpose was to benefit them to the extent disclosed by the provision of the trust clauses, and that purpose must prevail unless the testator has shown by clear language his intention to make its taking effect turn upon the contingency of his property remaining unchanged until his death. The true construction of the "further meaning" clause is, concededly, doubtful; and this fact alone goes far to defeat the claim that by it the testator intended to revoke the gifts made for the benefit of his grandchildren in the event of his subsequently converting the stocks and bonds mentioned in the trust provisions of his will, for it is a primary rule in the construction of wills that a clear intention on the part of the testator must appear in order to make a legacy specific. In ascertaining the true meaning of this clause, it is to be remembered that the testator's son, DeWitt Clinton Blair, occupies the position both of sole executor and of trustee for the several grandchildren. The clause does not expressly state whether the instructions contained in it are given to him in the one capacity or the other, but the *character* of those instructions makes it clear that they are given to him as executor. The trust clauses of the will had created general legacies. Being general legacies, it would have been the duty of the *executor,* if the stocks and bonds mentioned in the bequests to the trustee were not found in the estate of the testator at his death, to go into the market and purchase sufficient of the different kinds to make up the deficiency and turn them over to the trustee. The "further meaning" clause absolves the *executor* from this duty by providing that "he shall not be required to supply said bonds and stocks." It then imposes upon him, as

*executor,* a substituted duty, namely, that he shall "only take such as I may leave." That this last-recited clause is an instruction to the executor is apparent from the fact that this clause, and the one which precedes it, have but a single nominative. Did the testator, by this last provision, mean that his executor should, in distributing his estate, turn over to the trustee, in satisfaction of the trust legacies, only such of the bonds and stocks specifically mentioned in those provisions of the will by which the trusts were created as remained in his estate at his death, or did he mean that his executor should take from such other bonds and stocks as he should leave a sufficient quantity to fill up these bequests in case of a deficiency? In determining this question, the use of the word "further" is significant. Its purport is to amplify, to add to, not to negative, what has preceded it. The testator had already plainly expressed his meaning that these legacies should be general, not specific; in other words, that they should not be adeemed by his failure to leave the designated stocks and bonds at his decease. He then proceeded to show, not that he had a *different* meaning; not that he had, after making these bequests, changed his mind with regard to their character, but that he had a "further," an additional, intention with regard to them, and that was that his executor, instead of pursuing the usual course of supplying the securities named by him in the trust bequests, in case they were not found in his estate at his death, should take such other bonds and stocks as he might leave in order to supply the deficiency. In other words, that he preferred the particular method which he specified rather than that which the law, in the absence of such specification, would provide, for preventing a partial failure of these legacies.

The learned vice-chancellor expressed the opinion that even if, by the true construction of the "further meaning" clause, the executor was required to fill up any deficiency in the trust bequest from other bonds and stocks of the testator, the bequests, as to the stock, must fail for uncertainty, because no value was fixed by the testator's will upon the stocks bequeathed, and no reference was made therein as to the sums intended to be bequeathed in stocks. This conclusion does not seem to us to be

sound. What the testator did was to provide his own method of supplying deficiencies in the place of the method which the law would otherwise have provided. The method provided by law would have exactly made up the deficiency by requiring the executor to supply the identical stock. The testator provided for making it up by requiring the executor to supply other stock; not necessarily stock of an equal value per share, but stock of a value, in the aggregate, sufficient, nevertheless, to make up the deficiency; either a greater number of shares of less valuable stock or an equal number of shares of equally valuable stock, or a less number of shares of more valuable stock; but in either event shares of stock the total value of which should equal that of the shares for which they were substituted. The duty of taking from the stocks and bonds left by the testator a sufficient amount to make up deficiencies is charged by the will upon the executor. Upon him, primarily, therefore, rests the duty of making the selection, and it is to be presumed that he will perform that duty fairly, with a due regard to the rights of the *cestuis que trust*. Any failure on his part in this regard would entitle the *cestuis que trust* to the interference of a court of equity.

The conclusion reached by us as to the true construction of the trust clauses of the will leads to a reversal of the decree.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, DIXON, GARRISON, FORT, PITNEY, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY—11.